E-FILED
Thursday, 15 July, 2021 02:57:49 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | |
|---|---|
| ELIZABETH HUSTON, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>HEARST COMMUNICATIONS, INC.,<br><br>    Defendant. | Case No. 1:21-cv-01196<br><br>**CLASS ACTION COMPLAINT**<br><br>(JURY TRIAL DEMANDED) |

Plaintiff Elizabeth Huston ("Plaintiff"), individually and on behalf of herself and all others similarly situated, by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

### **INTRODUCTION**

1.     To supplement its revenues during the time period relevant to this action, Defendant Hearst Communications, Inc. ("Hearst") publicly used and held out Plaintiff's and the other Class members' identities for commercial purposes when it offered for sale and sold mailing lists that identified, by name, address, and other personal attributes, Plaintiff and every other Illinois subscriber to its magazine publications, including *Good Housekeeping* magazine to which Plaintiff subscribed.  Defendant's offers to sell its mailing lists were directed to the community at large, and indeed Defendant sold these lists to any member of the public willing to pay for them, including data miners, data aggregators, data appenders, data cooperatives, list brokers, aggressive marketing companies, political organizations, non-profit companies, and various other parties. Hearst's public use and holding out of Plaintiff's identity on the mailing lists that it sells and offers to sell (including in connection with the *Good Housekeeping* magazine subscription previously sold to Plaintiff) directly violated Illinois's Right of Publicity Act, 765 ILCS 1075, *et seq.* (the "IRPA").

2.     Documented evidence confirms these facts.  For example, Hearst, either directly

or through one or more intermediary acting on its behalf and at its direction, offers to sell to the community at large, and then sells to any member of the public interested in purchasing, the mailing list titled "GOOD HOUSEKEEPING Mailing List", which contains the full name, home address, and title of the publication subscribed to (collectively "Personal Reading Information") – as well as myriad other personally identifying attributes and demographic information such as gender, age, ethnicity, income, political party, religion, and charitable donation history—of each of the 1,715,229 active U.S. subscribers to *Good Housekeeping* magazine (including Plaintiff and each member of the Class) at a base price of "$115.00/M [per thousand]," (i.e., 11.5 cents apiece), as shown in the screenshot below from list broker NextMark, Inc.'s website:



See **Exhibit A** hereto.

3.      Hearst's practices of offering to sell to the community at large, and actually selling to any member of the general public interested in purchasing, mailing lists on which each of its subscribers is identified is not limited to *Good Housekeeping* magazine.  Hearst, either directly or through one or more intermediary acting on its behalf and at its direction (including through NextMark and/or one or more "list manager" and/or "list broker"), also sells and offers to sell the mailing list titled "HEARST CORPORATE MASTERFILE & ENHANCED Mailing List", which contains the Personal Reading Information of all 9,108,589 active U.S. subscribers to all of Hearst's various publications, among them Plaintiff and each member of the Class, at a base price of "$115.00/M [per thousand]," (i.e., 11.5 cents apiece), as shown in pertinent part in the screenshot below from list broker NextMark, Inc.'s website:



*See* **Exhibit B** hereto.

4.      The IRPA clearly prohibits what Hearst has done.  Section 30 of the IRPA provides:

> A person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent from the appropriate person or persons specified in Section 20 of this Act or their authorized representative.

765 ILCS 1075/30.  The IRPA defines "identity" as "an attribute of an individual that serves to identify the individual to an ordinary, reasonable viewer, or listeners including but not limited to (i) name, (ii) signature, (iii) photograph, (iv) image, (v) likeness, or (vi) voice."  IRPA § 5.  And the IRPA defines "commercial purpose" as "the public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of advertising or promoting products, merchandise, goods, or services; or (iii) for the purpose of fundraising." *Id.*  Thus, by offering to sell to the community at large and by selling, on the open market to the general public, mailing lists that identify, by name and other personally identifying attributes, each of the Illinois residents (including Plaintiff and each member of the Class) to whom it sold a subscription to a particular magazine, without any of these individuals' consent (written or otherwise), Hearst directly violated the IRPA.

5.      The IRPA was enacted to recognize each Illinois resident's right of publicity as the "right to control and to choose whether and how to use an individual's identity for commercial purposes." 765 ILCS 1075/10.  Hearst has deprived Plaintiff and class members of this right by surreptitiously selling mailing lists on which purchasers of subscriptions to its publications are identified, without notifying much less obtaining consent from Plaintiff and Class members prior to engaging in these practices, let alone allowing Plaintiff and Class members to control or choose whether and how their identities are used in this way.

6.      Hearst's public use and holding out of its subscribers' identities for commercial purposes is not only unlawful, it is also dangerous because it allows any member of the public willing to purchase this data to target particular subscribers, including vulnerable members of society, using their identity, interests and other demographic data.  So while Hearst profits

handsomely from the use of its customers' identities in this way, it does so at the expense of its customers' statutory right of publicity.

7.       Accordingly, Plaintiff brings this Class Action Complaint against Hearst for its unlawful use of its customers' identities in violation of the IRPA.

## PARTIES

8.       Plaintiff Elizabeth Huston is, and at all times relevant to this action has been, a natural person and a resident and citizen of the State of Illinois, residing in Peoria County.   During time period relevant to this action, Plaintiff purchased a subscription to Hearst's *Good Housekeeping* magazine while residing in, a citizen of, and present in Illinois.

9.       Defendant Hearst Communications, Inc. is a Delaware corporation with its headquarters and principal place of business in New York, New York.   Hearst does business throughout Illinois and the entire United States. Hearst is the publisher of *Bicycling*, *Car and Driver*, *Cosmopolitan*, *Country Living*, *Elle*, *Elle Decor*, *Esquire*, *Food Network Magazine*, *Harper's Bazaar*, *HGTV Magazine*, *House Beautiful*, *Marie Claire*, *Men's Health*, *Popular Mechanics*, *Prevention*, *Road & Track*, *Runner's World*, *Town and Country*, *Veranda*, *Woman's Day*, and *Women's Health* magazines, as well as its flagship publication *Good Housekeeping* magazine.

## JURISDICTION AND VENUE

10.       This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

11.       The Court has personal jurisdiction over Hearst because Plaintiff's claims arose in substantial part from actions and omissions in Illinois, including from Plaintiff's purchase of a *Good Housekeeping* subscription in Illinois, Hearst's direction of such *Good Housekeeping* subscription into Illinois, and Hearst's failure to obtain Plaintiff's written consent in Illinois prior to publicly using her identity to sell and offer to sell mailing lists identifying her as a *Good*

*Housekeeping* subscriber and containing other Personal Reading Information about her, including her name and residential address in Illinois, to another person, the effects of which were felt from within Illinois by Plaintiff, a citizen and resident of Illinois.  Personal jurisdiction also exists over Hearst in Illinois because Hearst conducts substantial business within Illinois, such that Hearst has significant, continuous, and pervasive contacts with the State of Illinois.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Hearst is subject to personal jurisdiction in this judicial District and because a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District.

## INTRADISTRICT ASSIGNMENT

13.     Pursuant to Local Rule 40.1(A), this case should be assigned to the Peoria Division.

## FACTUAL BACKGROUND

### *Illinois's Right of Publicity Act*

14.     Recognizing the need to protect its citizens' right of publicity, the Illinois legislature enacted the IRPA to establish as a matter of law that each resident of Illinois has the "right to control and to choose whether and how to use [his or her] identity for commercial purposes." 765 ILCS 1075/10.

15.     Thus, the IRPA prohibits companies from, *inter alia*, publicly using or holding out an individual's identity, such as their name, likeness, or other identifying attribute, on or in connection with the sale or offering for sale of a product, good, or service.  *See* 765 ILCS 1075/5, 30(a). Specifically, Section 30 of the IRPA states, in pertinent part:

> A person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent from the appropriate person or persons specified in Section 20 of this Act or their authorized representative.

765 ILCS 1075/30(a) (emphasis added).

16.     The IRPA defines "identity" as "an attribute of an individual that serves to identify the individual to an ordinary, reasonable viewer, or listeners including but not limited to (i) name,

6

(ii) signature, (iii) photograph, (iv) image, (v) likeness, or (vi) voice." 765 ILCS 1075/5.

17.    Despite the fact that scores of Illinois residents subscribe to Hearst's publications, Hearst disregarded its legal responsibilities to these individuals by offering for sale and selling to the community at large its customers' statutorily protected identifying information without their consent, in direct violation of the IRPA.

### The Personal Information Market: Consumers' Personal Information Has Real Value

18.    In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[1]

19.    More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[2]

20.    The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[3]

21.    In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators

---

[1]    The Information Marketplace:  Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/ public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

[2]    *See* Web's Hot New Commodity: Privacy, WSJ.com (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html.

[3]    Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2, *available at* https://www.ftc.gov/sites/default/files/documents/public_statements /remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (emphasis added).

then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[4]

22.      The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[5]

23.      Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[6]

24.      Recognizing the serious threat the data mining industry poses to consumers, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[7]

25.      In their letter, the co-Chairmen recognized that:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious

---

[4]      *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/.

[5]      Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of- consumer-database-marketing.html.

[6]      Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c.

[7]      *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information.

privacy concerns.[8]

26.      Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[9] including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like Hearst sell the identities of its customers to data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases of names and personal information" that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[10]

27.      Moreover, Hearst does not limit its sale of its subscriber mailing lists to data aggregators, but rather offers for sale and frequently sells these lists (again, on which purchasers of subscriptions to its publications are identified by name and address and other personally identifying attributes) to various other members of the general public who were willing to purchase them, either directly or through one or more intermediary acting on its behalf and at its direction. Indeed, the NextMark website and various other similar online subscriber list marketplaces are accessible to the general public, and are often used by members of the general public to facilitate purchases of Hearst's subscriber lists from Hearst.

28.      Information sales like Hearst's are particularly dangerous to the elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[11]  The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take

---

[8]      *Id.*

[9]      *See Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams.

[10]     Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html?pagewanted=all&_r=0.

[11]     *Id.*

advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[12]

29.     Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged.   Thus, information sales like Hearst's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[13]

30.     Hearst is not alone in jeopardizing its subscribers' rights to publicity in exchange for increased revenue: selling subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other parties on the open, publicly accessible market is a widespread practice in the publishing industry.

31.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth.   Unfortunately for consumers, this growth has come at the expense of their most basic rights.

***Hearst Unlawfully Sells and Offers to Sell Mailing Lists Containing its Customers' Names, Addresses, and Other Personal Reading Information***

32.     Hearst maintains a vast digital database comprised of its customers' identifying information and other Personal Reading Information.

33.     Hearst, either directly or through one or more intermediary acting on its behalf and at its direction (including through NextMark and/or one or more "list manager" and/or "list broker"), offers to sell and actually sells to the community at large lists containing its customers' names, addresses, and other Personal Reading Information on the open market to anyone willing to pay for it, including on a regular basis to data miners, aggregators, appenders, and cooperatives, aggressive marketing companies, other consumer-facing businesses, non-profit organizations

---

[12]     *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf.

[13]     *See id.*

seeking to raise awareness and solicit donations, and political organizations soliciting donations, votes, and volunteer efforts.  These lists identify individuals, by name and address (among other information), as having purchased subscriptions to particular magazines from Hearst.

34.     As a result of Hearst's data compiling and sales practices, any member of the public can purchase mailing lists from Hearst.  Hearst's practices of selling and offering to sell mailing lists that use its subscribers' identities in this way puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.

35.     Hearst does not seek its customers' prior written consent to any of these practices and its customers remain unaware that their identities, including their names, addresses, and other Personal Reading Information and sensitive demographic details (as well as information identifying the particular publication to which each of them subscribed), are on mailing lists that Hearst directs to the community at large and sells on the open market to any member of the public interested in purchasing them.

36.     Consumers can purchase Hearst subscriptions through numerous media outlets, including the Internet, telephone, or traditional mail.  Regardless of how the consumer subscribes, Hearst uniformly fails to obtain consent from—or even provide effective notice to—its customers before engaging in the practices described herein.

37.     By and through these actions, Hearst has intentionally publicly used Plaintiff's and numerous other Illinoisans' identities for commercial purposes without any of these individuals' prior written consent, in direct violation of the IRPA.

## **CLASS ACTION ALLEGATIONS**

38.     Plaintiff seeks to represent a class defined as:

> All Illinois residents who, at any point in the relevant statutory period, had their names appear on a mailing list sold or offered for sale to members of the public by Hearst without consent (the "Class").

39.     Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in the thousands.  The

11

precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the records of Defendant.

40.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to: (a) whether Hearst used Plaintiff's and the Class's "identities" for a "commercial purpose" by offering to sell to the community at large and/or selling to anyone willing to pay, mailing lists identifying by name each purchaser of a subscription to each of Hearst's publications; (b) whether Hearst obtained written consent before selling and offering for sale mailing lists identifying them as subscribers to particular publications by name, to anyone willing to pay; and (c) whether Hearst's practices of selling and offering for sale mailing lists identifying them as subscribers to particular publications by name, to anyone willing to pay, violated the IRPA.

41.     The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's practices of selling and offering for sale mailing lists identifying them as subscribers to particular publications by name, to anyone willing to pay.

42.     Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

43.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by

the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**CLAIM FOR RELIEF**
**Violation of the Illinois Right of Publicity Act § 30(a)**
**(By Plaintiff on Behalf of Herself and the Class)**

44.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

45.     Plaintiff brings this claim individually and on behalf of members of the Class against Defendant.

46.     Plaintiff is a "living . . . natural person" and thus an "individual" within the meaning of the IRPA.

47.     As a corporation in the business of publishing and selling magazine subscriptions, Hearst is a juristic "person" within the meaning of the IRPA.  *See* IRPA § 5.

48.     Plaintiff, an Illinois resident, purchased a subscription to *Good Housekeeping* magazine from Hearst during the time period relevant to this action. Each member of the Class likewise resides in Illinois and purchased from Hearst a subscription to one of its various publications.

49.     Prior to and at the time Plaintiff subscribed to *Good Housekeeping*, Hearst did not notify Plaintiff that it would publicly use her identity for commercial purposes by selling or offering to sell her Personal Reading Information—full name, home address, and title of the publication subscribed to—as well as myriad other personal and demographic information such as gender, age, ethnicity, income, political party, religion, and charitable donation history on the open market to any member of the public willing to pay for them, and Plaintiff has never consented (in

writing or otherwise) to Hearst doing so. Hearst likewise failed to notify any of its other subscribers, including the members of the Class, that it would use their identities for commercial purposes by selling or offering to sell their Personal Reading Information (or the Personal Reading Information of all of its customers) on the open market, and none of the members of the Class has consented (in writing or otherwise) to Hearst doing so.

50.     After Plaintiff purchased a subscription to Good Housekeeping from Hearst, and during the relevant statutory period, Hearst, either directly or through one or more intermediary acting on its behalf and at its direction (including through NextMark and/or one or more "list manager" and/or "list broker"), offered for sale to the community at large mailing lists containing Plaintiff's Personal Reading Information (which identified her as an individual to whom Hearst had sold a Good Housekeeping subscription) and sold those lists on the open market to any member of the public willing to purchase them, including to data aggregators, data appenders, data cooperatives, and various other persons interested in buying it to contact Hearst subscribers, without first obtaining Plaintiff's written consent or even giving her prior notice of its public use and holding out of her identity in this way. Likewise, during the statutory period relevant to this action, Hearst offered for sale to the community at large and sold on the open market to any member of the public interested in purchasing, mailing lists identifying the names and addresses (among other Personal Reading Information) of all of the individuals who had purchased subscriptions to its various publications, including Plaintiff and each member of the Class.

51.     The name "Elizabeth Huston," one of the identifying attributes Hearst publicly used, is "the actual name . . . by which [Plaintiff] is known that is intended to identify [her]," on the mailing lists that Hearst sold or offered for sale on the open market to anyone willing to pay for them. Accordingly, Hearst used Plaintiff's "identity" within the meaning of the IRPA. *See* 765 ILCS 1075/5.

52.     Hearst's offers to sell mailing lists on which Plaintiff's and the other Class members' identities appeared to the community at large, and its sale of those lists to any member of the public willing to pay for them, caused Plaintiff's and the class members' names and

14

additional identifying attributes to be made accessible to, and shared with, the community at large and exposed to general view by Hearst or by one or more intermediaries acting on its behalf and at its direction. Hearst's making accessible and sharing Plaintiff's and the class members' identities with the community at large, including any member of the general public willing to purchase them, constituted "public use or holding out" within the meaning of IRPA. *See Id*.

53. The subscriber mailing lists that Hearst sold and offered to sell constituted a "products," "merchandise," or "goods" within the meaning of the IRPA.

54. Thus, Hearst's sales and offers to sell mailing lists on which Plaintiff's and the other Class members' names appeared, on the open market to any member of the public willing to pay for them, constituted "the public use or holding out of [these] individual[s'] identit[ies] . . . on . . . a product, merchandise, [or] goods[.]" IRPA § 5. Accordingly, Hearst, either directly or through one or more intermediary acting on its behalf and at its direction (including through NextMark and/or one or more "list manager" and/or "list broker"), used Plaintiff's and the Class members' identities "for commercial purposes" within the meaning of the IRPA. 765 ILCS 1075/5.

55. Additionally, the subscription to *Good Housekeeping* that Hearst sold to Plaintiff, and the subscriptions to the various publications that Hearst sold to the members of the Class, each constituted a "product," piece of "merchandise," or a "good[]" within the meaning of the IRPA. *See* 765 ILCS 1075/5.

56. Thus, Hearst's sales and offers to sell mailing lists on which Plaintiff's and the other Class members' names appeared constituted "the public use or holding out of [these] individual[s'] identit[ies] . . . in connection with the offering for sale or sale of a product, merchandise, [or] good . . .," 765 ILCS 1075/5. Specifically, because the mailing lists identified by name individuals who had previously purchased subscriptions to particular publications from Hearst, Hearst's use of Plaintiff's and the other Class members' identities on the mailing lists it sold and offered to sell to the community at large was done in connection with its prior sales of a *Good Housekeeping* subscription to Plaintiff and subscriptions to its various publications to the other members of the Class. Accordingly, Hearst, either directly or through one or more

15

intermediary acting on its behalf and at its direction (including through NextMark and/or one or more "list manager" and/or "list broker"), used Plaintiff's and the Class members' identities "for commercial purposes" within the meaning of the IRPA. 765 ILCS 1075/5.

57.     By selling and offering to sell mailing lists on which Plaintiff's and the other Class members' names appeared (which identified each of them as having purchased a subscription to a particular publication sold by Hearst) to the community at large, to any member of the public willing to pay for them, without first asking for much less obtaining Plaintiff's or the other Class members' prior written consent, Hearst, either directly or through one or more intermediary acting on its behalf and at its direction (including through NextMark and/or one or more "list manager" and/or "list broker"), used Plaintiff's and the other Class members' identities for commercial purposes during their lifetimes in violation of section 30(a) of the IRPA. *See* 765 ILCS 1075/30(a).

58.     As a result of Hearst's nonconsensual public use and holding out of their identities for commercial purposes, Plaintiff and the members of the Class have suffered violations of their rights of publicity.  On behalf of herself and the Class, Plaintiff seeks: (1) an injunction requiring Defendant to obtain prior written consent from Illinois customers prior to the use of their identities for commercial purposes pursuant to 765 ILCS 1075/50; (2) $1,000.00 in statutory liquidated damages to herself and each Class member pursuant to 765 ILCS 1075/40 (a)(2); and (3) costs and reasonable attorneys' fees pursuant to 765 ILCS 1075/55.

## PRAYER FOR RELIEF

59.     WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant as follows:

A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B.      For an order declaring that Defendant's conduct as described herein violates the Illinois Right of Publicity Act, 765 ILCS 1075, *et seq.*;

C.      For an order finding in favor of Plaintiff and the Class on the count asserted

herein;

D.      For an injunction requiring Defendant to obtain prior written consent from Illinois customers prior to the use of their identities for commercial purposes pursuant to IRPA § 50;

E.      For an award of $1,000 to Plaintiff and each Class member, as provided by the IRPA § 40(a)(2);

F.      For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit pursuant to IRPA § 55; and

G.      For prejudgment interest on all amounts awarded.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: July 15, 2021          Respectfully submitted,

**NICK LARRY LAW LLC**

By: /s/ J. Dominick Larry

J. DOMINICK LARRY
nick@nicklarry.law
NICK LARRY LAW LLC
8 S Michigan Ave, Suite 2600
Chicago, IL 60603
Tel: (773) 694-4669
Fax: (773) 694-4691

*Local Counsel for Plaintiffs and the Putative Class*

Frank S. Hedin (admission to be sought)
fhedin@hedinhall.com
Arun G. Ravindran (admission to be sought)
aravindran@hedinhall.com
HEDIN HALL LLP
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: (305) 357-2107
Fax: (305) 200-8801

*Counsel for Plaintiff and the Putative Class*